UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

HOWARD JAY KAPLAN, #143064, )
)
Plaintiff, )            Case No. 1:11-cv-255
)
v. )            Honorable Robert Holmes Bell
)
MICHIGAN DEPARTMENT OF )
CORRECTIONS, et al., )            **REPORT AND RECOMMENDATION**
)
Defendants. )
_____ )

This is a civil rights action brought *pro se* by a state prisoner under 42 U.S.C. § 1983.

Plaintiff's claims arise from his confinement at the Carson City Correctional Facility (DRF) from

April 7, 2009, through August 18, 2011.  The defendants are the Michigan Department of

Corrections (MDOC), Prison Health Services, Inc. (PHS),[1] Jeffrey Stieve, M.D., Haresh Pandya,

M.D., Gamat Isaacs, M.D., Richard Miles, M.D., Bryan Buller, M.D., DRF's Warden Blaine Lafler,

and DRF's  Health Unit Manager, Eileen McKenna.  Plaintiff alleges that:

(1).    Drs. Pandya and Isaacs violated his Eighth Amendment rights by denying his
        requests for an air mattress and that PHS, Stieve, Pandya, Isaacs, Miles and Buller
        violated his Eighth Amendment rights by depriving him of "medical equipment;"
        (Compl. ¶¶ 8-9, 14-19, 84);

(2).    Drs. Stieve, Pandya, Isaacs, Miles, and Buller and PHS violated his Eighth
        Amendment rights in the medications they prescribed (*Id.* at ¶¶ 7-9, 20-39, 86);

(3).    MDOC, PHS, Warden Lafler, and Drs. Miles, Isaacs, and Buller violated his Eighth
        Amendment rights by denying his requests for specialist referrals (*Id.* at ¶¶ 4-6, 10,
        13, 40-48, 86);

_____

[1]PHS is now known as "Corizon Health, Inc."  (docket #s 55, ID# 655).

(4).     His First Amendment rights were violated:

(a).     When Drs. Stieve and Buller declined to prescribe plaintiff's preferred medications in retaliation for a grievance that plaintiff attempted to file on August 10, 2010, which was rejected by DRF's grievance coordinator; and

(b).     When Doctor Buller failed to respond with the desired speed in providing medical evidence supporting plaintiff's request for legal writer assistance (*Id.* at ¶¶ 7, 11, 50-61, 87);

(5).     Warden Lafler and the MDOC violated his rights under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA)[2] by allowing a prison elevator at DRF to be out of service for repairs for a total of 57 days during the twenty-month period from between April 7, 2009, through December 21, 2010 (*Id.* at ¶¶ 5, 13, 62-72, 88);

(6).     Doctor Buller violated his rights under the ADA and RA when he failed to move with the desired dispatch in providing medical evidence in support of plaintiff's request for a legal writer (*Id.* at ¶¶ 11, 73-76, 88);[3] and

(7).     Health Unit Manager McKenna violated his rights under the Fourteenth Amendment's Due Process Clause when she charged a $5 medical co-payment to plaintiff's prisoner account for medical services (*Id.* at ¶¶ 12, 77-83, 89).

Plaintiff seeks an award of damages against the corporate defendant, PHS, and Drs. Stieve, Pandya, Isaacs, Miles, and Buller, HUM McKenna, and Warden Lafler in their individual capacities. (Compl. ¶¶ 6-13 and page 20).  He requests injunctive relief against the MDOC and Warden Lafler in his official capacity based on the alleged ADA and RA violations at DRF.[4]  (*Id.* ¶¶ 5, 11, 13 and

---

[2]Plaintiff concedes that Warden Lafler is entitled to judgment in his favor on all plaintiff's claims with the exception of plaintiff's claims against the warden in his official capacity under the ADA and RA.  (*See* Plf. Brief at 29-30, docket # 44, ID#s 491-92).

[3]Defendant Buller is entitled to judgment in his favor on plaintiff's ADA and RA claims. "Plaintiff concedes that he can not sustain his burden of establishing a genuine factual dispute for trial and does not object to summary judgment for Bryan Buller." (Plf. Brief at 28, docket # 68, ID# 1133).

[4]Plaintiff has made clear that his ADA and RA claims are limited to claims against the warden in his official capacity.  (Plf. Brief at 29, docket # 44, ID# 491).  Plaintiff cannot possibly

page 19).  He seeks injunctive relief against Dr. Stieve in his official capacity based on the alleged

First and Eighth Amendment violations (*Id.* ¶ 7) and against PHS for alleged violation of his Eighth

Amendment rights (*Id.* ¶ 6).  Plaintiff makes a general request for declaratory relief on all claims and

that an injunction issue compelling defendants to begin providing him with treatment "consistent

with contemporary medical standards."  (*Id.* at pages 19-20, ¶ 1).

          The matter is before the court on defendants' motions for summary judgment.

(docket #s 18, 37, 55).  The parties have filed numerous briefs and extensive exhibits (*see e.g.*,

docket #s 19-21, 38, 44, 45, 47, 50, 55-56, 58, 68, 73, 77, 78, 80, 82-87).  Defendants' motions have

long been ready for decision.[5]  For the reasons set forth herein, I recommend that all plaintiff's

claims for declaratory and injunctive relief be dismissed as moot.  I further recommend that

defendants' motions for summary judgment be granted, and that judgment be entered in defendants'

favor on all plaintiff's claims for damages.

---

be entitled to injunctive relief against PHS on this claim because plaintiff did not allege any ADA
or RA claim against PHS.  (docket #1, p. 19, ¶ 3, ID# 19).  In addition, plaintiff's complaint contains
scattered references to the Sixth Amendment.  (*Id.* at ¶¶ 13, 72, 88 and page 20 at ¶ 4).  Plaintiff's
pleading does not allege facts sufficient to state a claim for violation of his Sixth Amendment rights
by any defendant.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5]The most recent of the summary judgment motions (docket # 55) has been pending for
almost a year and the oldest (docket # 18) has been pending for an unprecedented twenty months.
Plaintiff has requested and received numerous extensions of time to respond to defendants' motions,
but he cannot be permitted to postpone a decision indefinitely.  On February 22, 2013, plaintiff sent
a letter addressed to the Clerk of the Court implying that he required more time to conduct discovery.
(docket # 89).  There is no reason for further delay.  Plaintiff filed this lawsuit in March 2011.  Two
years constitutes more than sufficient time to conduct discovery.

## Applicable Standards

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). The court must draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1). FED. R. CIV. P. 56(c)(1). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e)(2), (3); *see Bozung v. Rawson*, 439 F. App'x 513, 518-19 (6th Cir. 2011). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543,

549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Donald v. Sybra, Inc.*, 667 F.3d 757, 760-61 (6th Cir. 2012).

## Facts

The following facts are beyond genuine issue. Plaintiff is serving multiple life sentences in the custody of the Michigan Department of Corrections (MDOC) on his criminal convictions.[6] He is currently an inmate at the Chippewa Correctional Facility (URF).

### Medical Care

Plaintiff has a lengthy history of medical treatment during his incarceration, particularly for his respiratory problems and degenerative disc disease. (*see* docket # 1-2, ID#s 25-39, 43-47; docket # 1-3, ID#s 73-74; docket # 45, ID#s 570-72; docket # 55-2, ID#s 692-93; docket # 58, ID#s 809-20). For example, on September 19, 2007, plaintiff was examined at Duane Waters Hospital and described as an "older-looking 51-year-old gentleman." Neurosurgeon Haresh Rawal noted that plaintiff was a "heavy smoker" and that he "continue[d] to smoke." (docket # 1-2, ID# 43). Plaintiff used a cane as a walking aid. The surgical options available for treating the degenerative changes in plaintiff's spine were limited. His smoking and the use of steroids to treat his emphysema made surgical intervention risky and unlikely to succeed. Dr. Rawal recommended that plaintiff "be treated symptomatically." (docket # 1-2, ID#s 43- 44).

On April 14, 2008, plaintiff was an inmate at the Thumb Correctional Facility. Plaintiff was able to secure temporary approval for an extra mattress from Joseph R. Burtch, M.D.,

---

[6]*See People v. Kaplan*, No. 172567, 1997 WL 33348025, at * 1 (Mich. Ct. App. May 30, 1997).

because plaintiff was being evaluated for possible back surgery. (docket # 1-2, ID# 49; docket # 38-2, ID# 414; docket # 47-1, ID# 593). Dr. Burtch later obtained temporary approval for plaintiff to use an air mattress from June 23, 2008, through January 2, 2009. (docket # 1-2, ID# 49, docket # 47-1, ID# 596). On August 22, 2008, Dr. Rawal noted that plaintiff's bone scan showed severe osteoporosis. He was reluctant to attempt surgical intervention because "not only the results may not be long lasting, but the hardware may break through." (docket # 1-2, ID# 46). On April 7, 2009, plaintiff was transferred from the Mound Correctional Facility (NRF) to the Carson City Correctional Facility (DRF).

The primary focus of plaintiff's complaint is the adequacy of the medical care he received at DRF from April 7, 2009, through August 18, 2011. In April, 2019, plaintiff was receiving Ultram, Neurontin, and other medications then authorized by the Pain Management Committee (PMC) and prescribed by plaintiff's treating physicians. (docket # 55-2, Isaacs Decl. ¶¶ 3-9, ID#s 692-93). The MDOC established the PMC to address the appropriate and consistent management of pain for MDOC inmates. Wherever possible, the PMC follows established protocols to treat the chronic pain to a medically recognized standard. The result of this process may not result in a plan that completely satisfies the patient, especially if the patient has a substance abuse history, unrealistic expectations of pain control, or is unreceptive to education regarding his pain management plan. Pain control must be balanced with the need to function in life and to minimize the risk of prescription drug abuse. Excessive medication, while it may resolve the patient's pain, will threaten the patient's health and undermine the quality of the patient's life. In addition, prescription drug abuse has become a rampant national problem. Deaths from opioid pain relievers such as Vicodin exceed those from all illegal drugs combined. (docket # 55-2, Isaacs Decl. ¶ 18,

ID#s 696-97; docket # 73-2, Jeffrey Bomber, D.O., Aff. ¶¶ 4-5, ID#s 1264-65).[7] The correctional setting compounds the problems with pain medications. Pain medications can be very dangerous because they are used illicitly to get high, are traded for contraband, and are used in suicide attempts. Even when the patient does not intend to misuse the prescription, the patient becomes a target of violence or other manipulation to obtain access to the patient's drugs. In addition, many inmates have a history of drug abuse and the use of narcotic analgesics may cause the recurrence of dependence. The PMC recognizes the dangers involved in the correctional setting and must assess every pain medication with the issue of abuse in mind. Consequently, the PMC may modify recommendations received from outside of prison based on the special needs of the MDOC healthcare system. The PMC may also modify the access a patient has to his pain medication due to behaviors such as diversion, cheeking of medications, selling of medications, hoarding of medications, taking medications in excess of the recommended dosage, or refusing medications. (Bomber Aff. ¶ 6, ID# 1267).

Upon arrival at DRF, plaintiff complained that an air mattress had not been sent from NRF. Plaintiff was advised that the temporary approval he had obtained for this item had expired. (docket # 38-3, ID# 426). Plaintiff had been approved for a second mattress, and he was advised to obtain it through his housing unit. (docket # 38-3, ID# 425; docket # 55-2, ID# 694; docket # 58,

---

[7]Plaintiff's request that Dr. Bomber's affidavit be stricken (docket # 77 at 2, 9-11, ID#s 1357, 1364-65) is frivolous. Bomber is a doctor of osteopathic medicine licensed to practice in the State of Michigan. (docket # 73-2, Bomber Aff. ¶ 2, ID# 1264). Plaintiff's disagreement with Dr. Bomber's professional opinions is not a basis for excluding them. Equally frivolous is plaintiff's argument that his "medical records in many instances, have been deliberately and materially falsified to mislead subsequent reviewers." (docket # 68 at 15, ID# 1120; docket # 45 at 2, ID#s 570-71). Plaintiff presents no evidence to support his assertion that medical records have been deliberately or materially falsified. All plaintiff's medical records are considered herein, as are his assertions that various medical records are inaccurate.

ID#822). Plaintiff filed a grievance complaining that DRF's intake nurse had not provided him with the air mattress that he had requested. (docket # 1-3, ID#s 55-58). The Step I denial of his grievance and Step II denial of his appeal noted that plaintiff's approval for the air mattress had expired on January 2, 2009, months before his transfer to DRF. (*Id.* at ID#s 59-60). The denial of plaintiff's grievance was upheld at Step III of the MDOC's grievance process. (*Id.* at ID# 68).

On April 18, 2009, plaintiff complained to a nurse that he was experiencing back pain. When the nurse advised plaintiff that he could provide him with a detail for ice, plaintiff's response was: "F___ you. Ice ain't going to cut it. If this Ultram and Neurontin doesn't work you better call the f__ing ambulance. I don't know why you people just can't give me my ___ air mattress." Plaintiff received his 8 p.m. dose of medication. He left health care stating: "I guess I'm just going to have to fall out to get a f___ing air mattress here." (docket # 38-3, ID# 428; docket # 55-2, Isaacs Decl. ¶ 13, ID#s 694-95; docket # 58, ID# 826).

On the night of April 18, 2009, reported that he had fallen out of bed. He was transported from DRF to Carson City Hospital where he was diagnosed with a low back strain and a hip contusion. He was treated with Dilaudid and Vicodin and returned to DRF. (docket # 1-2, ID#s 105-06; docket # 58, ID#s 935-38). Shortly after returning to DRF, plaintiff made a statement about overdosing on heroin. Temporary suicide precautions were implemented. (docket # 55-2, Isaacs Decl. ¶¶ 16, 17, ID#s 695-96). Progress notes indicate that plaintiff appeared to be "malingering suicidal thoughts for secondary gain - hoping to get an air mattress for his room." (docket # 58, ID#s 827-31).

On April 20, 2009, Dr. Isaacs examined plaintiff. Plaintiff wanted stronger medication, examination by a specialist, and approval for an air mattress. (docket # 55-2, Isaacs

Decl. ¶ 17, ID# 696; docket # 58, ID# 833). Plaintiff was already receiving "substantial dosages" of Ultram and Neurontin then authorized by the Pain Management Committee (PMC). Dr. Isaacs determined that further monitoring rather than an increased dosage was the appropriate medical response. Dr. Isaacs was concerned that plaintiff had recently threatened to engage in self-injurious behavior. Also, he avers that inmates often abuse pain medications to get high or to trade for other contraband items. (*Id.*, Isaacs Decl. ¶ 34, ID# 701). On April 21 and 22, 2009, plaintiff's condition appeared "remarkably improved" and he was taken off suicide observation. (docket # 58, ID#s 832, 834-35). On April 25, 2009, Dr. Pandya declined to approve plaintiff's request for an air mattress. (Pandya Aff. ¶ 4, docket # 38-2, ID# 414). Dr. Pandya is the MDOC's Regional Medical Officer for the Southern Region and the PMC Chairman.

On June 9, 2009, x-rays taken of plaintiff's left shoulder returned normal results. X-rays of his cervical spine showed no evidence of fracture or acute osseous abnormality. Plaintiff's discs showed degenerative changes at the C3-4, C5-6, and possibly C6-7 levels with evidence of joint space narrowing and co-vertebral arthritis with spondylolysis. He had a severely degenerated disc at L5-S1, with "milder degenerative changes" in the remainder of his spine. (docket # 1-2 , ID#s 40-41; docket # 55-2, Isaacs Decl. ¶ 25, ID# 698; docket # 58, ID#s 846-47). On June 25, 2009, Dr. Isaacs found that plaintiff's diagnosis was unchanged. Physicians had achieved good control of his COPD and chronic bronchitis. He had degenerative disc disease of the lumbar and cervical spine. (docket # 1-2, ID# 135; docket # 47-2, ID# 601). Progress notes indicate that plaintiff was receiving a total of ten medications. (docket # 1-4, ID#s 133-34).

On June 29, 2009, plaintiff filed a grievance complaining about the adequacy of the responses to various kites he had filed regarding medical care at DRF. (docket # 1-3, ID#s 77-84).

On July 8, 2009, plaintiff's grievance was rejected because it was untimely. Further, the Step I grievance response stated: "[G]rievant has been evaluated by the Medical Provider (MP) and medication needs have been evaluated by the Pain Management Committee (PMC). The grievant has been seen by nursing multiple times. The treatment desired by the grievant is not medically indicated at this time." (docket # 1-3, ID# 85). The rejection of plaintiff's untimely grievance was upheld at Steps II and III of the MDOC's grievance process. (docket # 1-3, ID# 95).

On July 30, and September 4, 2009, plaintiff wrote letters to Dr. Isaacs complaining about perceived deficiencies in the medical care he was receiving at DRF. (docket # 1-3, ID#s 100-04). On September 11, 2009, Dr. Isaacs examined plaintiff. (docket # 1-2, ID# 49; docket # 47-2, ID# 602; docket # 55-2, Isaacs Decl. ¶ 29, ID# 700). Based on the results of this examination, Dr. Isaacs sought approval for an air mattress and a TENS unit. (docket # 55-2, Isaacs Decl. ¶ 30, ID# 700). Both these requests were approved on September 14, 2009. (docket # 1-2, ID# 52; docket # 38-2, ID# 414; docket # 38-3, ID # 432-33; docket # 55-2, Isaacs Decl. ¶ 31, ID# 700). On September 11, 2009, Dr. Pandya approved the request for approval of an air mattress based on Dr. Isaacs' notation suggesting that plaintiff had a history of skin breakdown in the past on his left hip/buttock area. (docket # 38-2, Pandya Aff. ¶ 5, ID# 414; docket # 58, ID# 860). Dr. Isaacs last worked at DRF on October 2, 2009. A physician's assistant forwarded Dr. Isaacs' request for a re-evaluation of plaintiff's treatment plan by the PMC. (docket # 38-2, Pandya Aff. ¶ 6, ID# 415; docket # 55-2, Isaacs Decl. ¶ 30, ID# 700; docket # 58, ID# 850).

On January 16, 2010, plaintiff reported that he was having difficulty urinating and was experiencing pain in his groin and back. He had a history of an enlarged prostate. Plaintiff was transported outside the prison to Carson City Hospital. (docket # 38-3, ID# 436). Plaintiff was

examined by Michael Blake, D.O. In response to plaintiff's complaints of pain, Dr. Blake gave plaintiff injections of Dilaudid and a muscle relaxant. (Compl. ¶¶ 29-30, ID# 7; docket # 1-3, ID# 105, docket # 58, ID#s 929-36). Plaintiff was not admitted as a patient. (docket # 38-3, ID# 437). The non-prison physician supplied six Vicodin for later use, but prison doctors. would not approve dispensing this narcotic medication and insisted on continuation of plaintiff's then-existing medication regimen. (Compl. ¶ 31, ID# 8; docket # 1-3, ID# 105;docket # 38-3, ID# 442; Plf. Decl. ¶ 16, docket # 45, ID# 573; docket # 58, ID# 869). Opioids are not considered appropriate for the management of chronic pain. (Bomber Aff. ¶ 9, ID#s 1267-68).

The PMC avoids prescribing opioid analgesics for pain control and instead uses anticonvulsants and tricyclic antidepressants such as Tegretol, Elavil, Pamelor, and Dilantin for long-term control of pain. (Bomber Aff. ¶ 7, ID#s 1266-67). Opioid analgesics, also known as narcotics, are a class of medications that affect the opioid receptors within the central and peripheral nervous system and gastrointestinal tract. Examples of these medications include Morphine, Methadone, and Vicodin (acetaminophen and hydrocodone). While opioids are effective analgesics, their common and serious side effects include psychological and physical addiction. Many other common side effects of opioids are dangerous in the correctional setting, including sedation, tolerance, and respiratory depression. Relevant to the long term use of opioids, tolerance means that the medication loses its effectiveness for pain control. Tolerance develops within two months; after that point, the provider would need to increase the dosage of the medication to achieve the same level of pain relief. Unfortunately, patients often do not acclimate or adjust to the side effects of opioids. Thus increasing opioid dosage increases the side effects. The longer one uses the opioid medication, the less effective and more dangerous that medication becomes. (Bomber Aff. ¶ 8, ID# 1267). In light

of the aforementioned dangers, in Michigan's prisons opioids are prescribed in limited circumstances: (1) short term prescriptions to control pain from significant trauma, such as substantial surgery or broken bones; and (2) for pain control in cancer patients. (Bomber Aff. ¶ 9, ID#s 1265-66).

The PMC utilizes anticonvulsants and tricyclic antidepressants for long-term control of pain. Dilantin, Neurontin, and Tegretol are anticonvulsant medications initially developed to treat seizures. Pamelor and Elavil are tricyclic antidepressants initially developed to treat depression. However, since the mid-eighties, peer-reviewed publications have confirmed the analgesic properties of these medications for the management of chronic pain, including the type of pain that plaintiff experiences, neuropathic pain. Neuropathic pain is pain arising from injury or disease of the sensory system; this would include nerve pain arising from spinal stenosis. At this juncture, Pamelor and Elavil are the most commonly prescribed antidepressant medications prescribed for pain relief. (Bomber Aff. ¶ 10, ID# 1268). It takes time for these medications to provide pain relief. The medications increase the level of neurotransmitters in brain tissue and inhibit the process by which the brain feels pain. The effect is gradual; often the patient does not realize that his pain is abating, but objectively the patient's functionality - ability to perform the activities of daily living - significantly improves. A patient may need to try several different types of medications to find the one that is most effective; it is further expected that titration of dosage (increasing dosage in incremental steps) may be necessary to find the appropriate level of pain control. (Bomber, Aff. ¶ 11, ID# 1269).

On January 18, 2010, Dr. Pandya modified plaintiff's medications. Plaintiff states that the alternative supplied was "a non-effective medication." (Compl. ¶¶ 32, 33, ID# 8). On

January 20, 2010, plaintiff's case was evaluated by the Pain Management Committee. Plaintiff has a history of osteoarthritis with pain in multiple joints, osteoporosis, chronic obstructive pulmonary disease, chronic low back pain, drug abuse, benign protsatic hypertrophy, and migraine headaches. The lower back pain is neuropathy from spinal canal stenosis (narrowing of the spinal canal). Plaintiff's medical records show that in the past, he has used Ibuprofen excessively and diverted Neurontin. Neurontin, unlike Dilantin and Tegretol, can induce euphoria, making it subject to abuse. Plaintiff uses a wheelchair for mobility, but has been observed walking. Walking is one of the most effective ways for plaintiff to reduce his pain through weight-bearing exercise. (Bomber Aff. ¶ 12, ID#s 1269-70). After a detailed examination of the data, the PMC recommended modification of plaintiff's pain management control plan. (Pandya Aff. ¶ 6, ID# 415; Stieve Aff. ¶ 5, ID# 286; Bomber Aff. ¶ 13, ID# 1270). This included recommendations for new medications, slowly tapering plaintiff off the medications that had been recommended by the PMC in 2008, and discontinuing plaintiff's use of the air mattress, because the evidence presented showed that he had no history of skin breakdown. (docket # 38-2, Pandya Aff. ¶ 6, ID# 415). The specific PMC recommendations were as follows:

> TYLENOL UP TO 2 GM/DAY
> FORMULARY NSAID OF CHOICE; ROTATE Q 3-4 MOS
> TEGRETOL (CARBAMAZEPINE)100 MG PO Q AM, THEN AFTER 4 DAYS 100 MG IN AM, 100 MG PM, THEN AFTER 4 MORE DAYS 200 MG Q AM AND 100 MG Q PM, THEN AFTER ANOTHER 4 DAYS 200 MG BID. START AFTER NEURONTIN STOPPED
> ULTRAM 50 MG 1 02 TID STOP
> NEURONTIN 800 MG TID, TAPER AND STOP OVER 2 MONTHS
> NOT APPROVED FOR MATTRESS
> TENS UNIT OK[.]

(docket # 38-3, ID# 444; Bomber Aff. ¶ 13, ID# 1270; docket # 58, ID# 852).

The PMC's actions represent a collective decision based on a review of the medical data pertinent to each individual case. (docket # 38-2, Pandya Aff. ¶ 7, ID# 415). The PMC recommendation was consistent with current literature on the effective management of chronic pain such as Mr. Kaplan's. First, plaintiff is receiving a combination of therapies to improve his condition. The PMC recommended three different types of analgesic medications: Tylenol, NSAID (anti-inflammatory), and a new anti-convulsant (Tegretol exchanged for Neurontin).[8] Second, the PMC authorized the conservative treatment of a TENs unit - an electrical stimulation device - for improved pain control. Finally, plaintiff was encouraged to walk. Exercise is very effective for lower back pain. "The single most effective action Mr. Kaplan could take to improve his back pain and osteoporosis is to get up and walk." (Bomber Aff. ¶ 16, ID# 1271). Plaintiff has been offered Dilantin, Pamelor, and Elavil as alternative medications, all of which he has refused to take on a long-term basis to develop the full effects. (*Id.* at ¶ 1, ID# 1270). Tricyclic antidepressants and anticonvulsants have an established track record of effectiveness in the treatment of chronic pain. (Bomber Aff. ¶ 17, ID# 1272). Although any medication may have side effects, there is no evidence that plaintiff suffered any side effects that would pose a danger to him. By contrast, given plaintiff's COPD, opioid medication would pose a significant risk to his health, and given its highly addictive nature and predilection for tolerance, would require higher and higher doses. (*Id.* at ID#s 1272-73).

On January 20, 2010, plaintiff filed a grievance asking that he be provided with Vicodin or other substitute medication. (docket # 1-3, ID#s 109-12; docket # 19-6, ID#s 296-99).

_____

[8]Plaintiff recently began requesting "Cymbalta (duloxetine), a SNRI antidepressant." Cymbalta is not considered more effective or less likely to cause side effects than tricyclic antidepressants. (Bomber Aff. ¶ 15, ID# 1271).

Plaintiff's grievance was denied at Step I and the denial was upheld at Steps II and III of the MDOC's grievance process. (docket # 1-3, ID#s 108, 114-17; docket # 19-6, ID#s 294-95, 300).

On March 15, 2010, plaintiff was examined by Richard Miles, M.D. Plaintiff was refusing to take his medications. Plaintiff stated that pain medications authorized by the PMC did not work. His complaints were referred back to the PMC for a determination whether plaintiff's medications should be modified. (docket # 38-3 at ID# 477; docket # 47-3, ID# 607; docket # 55-5, Miles Decl. ¶¶ 25-27, ID#s 731-32). Plaintiff made similar complaints to Dr. Miles during a May 27, 2010 examination. (docket # 1-4, ID# 141; docket # 38-3 at ID # 448, docket # 47-3, ID# 606).

On June 2, 2010, plaintiff filed a grievance against Dr. Pandya complaining about his medications, the air mattress, and purported retaliation. Plaintiff demanded that an earlier pain management protocol be reinstated and that Dr. Pandya "must no longer take active participation in Grievant's Health Care Decisions." (docket # 1-3, ID# 69). This grievance was rejected at Step I by DRF's grievance coordinator. (*Id.*). On June 15, 2010, the rejection of this grievance was upheld at Step III of the MDOC's grievance process. (*Id.* at ID# 71).

On July 5, 2010, Dr. Coleman conducted a medical chart update. He stated that he would not recommend any additional medications because plaintiff was already provided with Baclofen, Tegretol, and Tylenol. Dr. Coleman expressed concern regarding how plaintiff was "frequently getting an opioid ([U]ltram)." (docket # 58, ID# 886). On July 8, 2010, plaintiff advised a physician's assistant that he "would not take any tricyclic antidepressants." (docket # 58, ID#s 887-88). A week later, he wrote a kite stating: "[B]efore I even consider taking either pamelor, tegretol, dilantin, or elavil I require complete disclosure [of] prod. info including any information relevant to its use for level 8 pain fr[om] a recognized authority other than PHS." On July 16, 2010,

a nurse responded that plaintiff would be provided with product information regarding the aforementioned medications.  (docket # 58, ID# 889).

On July 20, 2010, Dr. Stieve completed his review of plaintiff's medical records and made his recommendations regarding plaintiff's treatment and pain management.  (Stieve Aff. ¶ 6, ID# 286).  Dr. Stieve noted that given plaintiff's "degree of osteoporosis and lung dysfunction, Dr. Rawal and many other medical providers, ha[d] informed the inmate that he is not a surgical candidate." (docket # 1-5, ID# 143).  Plaintiff was "at high risk for fracture and serious pulmonary disease as a result of his osteoporosis, sedentary (wheelchair) lifestyle, and heavy smoking history. It appeared that plaintiff was unlikely to regain his previous functional levels and would likely continue to deteriorate despite the best of medical care." (*Id.*).  Plaintiff did not meet the criteria for an air mattress, double mattress, or wheelchair gloves.  (docket # 44-2, ID# 499).  Dr. Stieve noted that plaintiff had been educated on numerous occasions on how to treat his back.  Despite this advice, he had been caught diverting Neurontin and had refused medications and health care suggestions.  (docket # 1-5, ID# 143).  Dr. Stieve offered his medical opinion that narcotic medications were inappropriate for plaintiff's condition.  Further, he noted that "with the diversion history and respiratory depressive side effects these may lead to a fatal pulmonary infection if abused." (docket # 1-5, ID# 144; docket # 21, ID#s 343-44; docket # 44-2, ID#s 499-500; docket # 58, ID#s 890-91).  Plaintiff denies diverting his Neurontin, (Plf. Decl. ¶ 3, docket # 45, ID# 570; Plf. Decl. ¶ 24 docket # 47-5, ID# 625), but he concedes that he purchased and used another prisoner's Neurontin.  (docket # 68, Plf. Brief at 6, ID# 1111; Plf. Decl. ¶ 5, docket # 47-5, ID# 625).

Plaintiff indicates that in 2010 he had two discussions with a physician's assistant regarding a possible referral to a neurologist for another bone density test.  He states that this request

"was subsequently disapproved by PHS." (Compl. ¶ 42, ID# 10). Dr. Buller began treating plaintiff on July 28, 2010. He updated plaintiff's chart and noted that he had multiple prescription. (docket # 55-4, Buller Decl. ¶ 37, ID# 716; docket # 58, ID#s 893-94). On July 30, 2010, plaintiff made a request for a referral to a pain management specialist. On August 3, 2010, Dr. Buller advised plaintiff that PHS would not approve this request. (Compl. ¶ 43, ID# 10; Plf. Decl. ¶ 20, docket # 45, ID# 574). Dr. Buller planned to have plaintiff's NSAID medication rotated every three months. He prescribed Tylenol, Tegretol, and Pamelor or Elavil. He continued plaintiff's TENS unit and discontinued the gloves and mattress special accommodations per Dr. Stieve's recommendations. (docket # 1-4, ID#s 123-25; docket # 55-4, Buller Decl. ¶ 38, ID#s 716-17).

On April 10, 2010, Dr. Buller summarized the results of his examination of plaintiff as follows:

> On August 10, 2010, I saw the patient for a chronic care visit and review of the administrative progress note of July 20, 2010, by Dr. Stieve. The patient was upset that the bedding and muscle relaxants were terminated. I discontinued the air mattress; double mattress; and wheelchair gloves per Dr. Stieve's direction. I stopped the Baclofen and tapered off the Vistaril. I noted that the patient may use Tegretol as needed for pain. The patient refused to try Pamelor or Elavil. I noted that I would schedule the patient for chronic care clinic to follow his condition on or about September 15.

(docket # 55-4, Buller Decl. ¶ 42, ID # 717).

Plaintiff states that on August 10, 2010, he attempted to file a grievance against Drs. Stieve and Buller, but it was rejected by the prison's grievance coordinator. (Compl. ¶ 38, ID# 12).

On September 28, 2010, plaintiff refused to take the Tegretol provided. (docket # 58, ID# 901). On September 29, 2010, plaintiff advised Dr. Buller that he did not like Tegretol because he did not like the way it made him feel. He reported that Elavil gave him a rash, made him sleepy, and caused stomach pain. He refused to take Dilantin because of its potential side effects. Dr. Buller

initiated a trial of Pamelor. (docket # 55-4, Buller Decl. ¶ 45, ID#s 717-18). Sometime during this examination, plaintiff indicated that he was having difficulty getting work done in the prison's law library because he was not able to sit long enough. He stated that he had applied for a legal assistant. Records indicate that on August 5, 2010, plaintiff's request for legal writer services had been denied. (docket # 1-5, ID# 159). Dr. Buller's September 29, 2010 progress notes state: "I did check about an assistant for the library. If there is a request for an assistant because of medical reasons I can confirm to whomever is investigating, that a patient has a medical disability if the patient has signed a release." (docket # 1-5, ID# 163; docket # 58, ID# 903; docket # 77-1, ID# 1376). On October 5 and 8, 2010, plaintiff sent releases to Dr. Buller. (docket # 1-5, ID# 164-66). Plaintiff did not send the releases to Dr. Buller until after DRF's librarian made a decision on October 4, 2010, denying plaintiff's request for a legal writer. (Compl. ¶ 57, ID# 13; docket # 1-5, ID#s 160, 165).

On October 22, 2010, plaintiff requested an increased dosage of Pamelor. (docket # 58, ID# 906). Progress notes dated November 2010, reveal that plaintiff was refusing to take Pamelor. (docket # 58, ID#s 908, 910). In December 2010, plaintiff was receiving Tegretol, but was requesting a trial of Dilantin. (docket # 58, ID#s 912-13). Plaintiff had previously indicated that he "did not want Dilantin due to the potential side effects." (docket # 55-4, Buller Dec. ¶ 51, ID# 719).

In January 2011, plaintiff was receiving seven different medications. Plaintiff stated that Pamelor did not provide him with adequate pain relief and he did not like the way it made him feel. Tegretol helped with his peripheral neuropathy, but he "did not like the way it made him feel." Plaintiff stated that he "liked Neurontin better." (docket # 47-3, ID# 608). Plaintiff received the trial of Dilantin that he had requested. (docket # 58, ID# 915-16). On February 5, 2011, plaintiff asked for an increased Dilantin dosage. (docket # 58, ID# 918).

Plaintiff states that on February 15, 2011, he was in the med-line where he was "supposed to receive Dilantin," and that Nurse Miller gave him medication that should have been delivered to another inmate. (docket # 44-4, Plf. Decl. ¶¶ 1-2, ID# 557). He states that the medication he erroneously received "contained Neurontin, and a significant dose of Morphine (60 mg), which almost completely controlled [his] pain and was tolerated without any adverse effect on his respiratory function." (*Id.* at ¶ 3, ID# 558). Progress notes for February and March 2011 reveal that plaintiff was refusing to take Dilantin. (docket # 58, ID# 922).

On March 7, 2011, Dr. Buller met with plaintiff and confirmed that he did not want to take Tegretol or Dilantin as recommended by the PMC. Plaintiff did not believe that the medical benefits of these medications outweighed what he perceived as dangerous side effects. On March 9, 2011, Dr. Buller stopped plaintiff's Dilantin prescription. (docket # 55-4, Buller Decl. ¶ 61, ID# 720; docket # 58, ID#s 924-26). On March 11, 2011, plaintiff filed a grievance demanding that he be "removed from the med-lines." He stated that he was no longer going to take Dilantin and that he had "no intention of being dragged out in inclement weather" just to refuse to take this drug. (docket # 47-4, ID#s 618-19). On March 16, 2011, plaintiff filed this lawsuit.

Plaintiff continues to receive significant medical care. (Plf. Decl. ¶¶ 2- 5, docket # 51-1, ID#s 634-35; Plf. Decl. ¶¶ 17-21, docket # 68, ID#s 1224-25, 1228; Plf. Decl. ¶¶ 3-6, ID#s 1473-81). On August 18, 2011, he was transferred to another prison.

In the medical judgment of Drs. Buller, Miles, Bomber, and Pandya, the pain medications offered by the PMC – Pamelor, Dilantin, Tegretol, and Elavil – are effective for the long-term management of neuralgia and radiculopathy, the type of pain experienced by plaintiff. These types of medications do not result in instant relief, as would be expect from a narcotic such

as Vicodin, but must be consistently taken over a period of time to become effective. However, they pose significantly less risk to a patient's long term health than narcotics. Further, the medical experts indicate that prescribing narcotic medication for plaintiff would pose a significant risk to his health. (docket # 55-4, Buller Decl. ¶ 66, ID#s 720-21; docket # 55-5, Miles Decl. ¶¶ 61, ID# 739; docket # 73-2, Bomber Aff. ¶¶ 5-17, ID#s 1265-72; docket # 38-2, Pandya Aff. ¶ 9, ID# 415).

$5 Charge to Plaintiff's Prisoner Account

Plaintiff states that he fell on July 4, 2010, and was required to fill out an accident report. (Compl. ¶ 78, ID# 16). On July 5, 2010, plaintiff was examined by Nurse Hogan. Plaintiff related that "while standing in his room trying to move his upright footlocker [he] fell on his butt," and pulled the locker onto his left leg. Plaintiff reported back pain. The nurse advised plaintiff to rest and gave him a detail for ice. (Compl. ¶ 79, ID# 16; docket # 58, ID#s 885-86). Plaintiff states that when Nurse Hogan asked him to "sign a kite to authorize a co-pay," he informed the nurse that he would not do so "as he had received no treatment." (*Id.*).

MDOC prisoners are provided with necessary health care services regardless of their ability to pay. Prisoners are generally charged a $5 co-payment for each medical visit. (P.D. 03.04.101 ¶ D). Plaintiff's examination on July 5, 2010, did not fall within any exception to the general rule. (*Id.* at ¶ J).

On July 16, 2010, a $5 co-payment was deducted from plaintiff's prisoner account. On July 23, 2010, plaintiff discovered the $5 charge. He states that someone informed him that Health Unit Manager (HUM) McKenna had authorized the deduction. (Compl. ¶ 81, ID# 17). Ms. McKenna was DRF's Health Unit Manager (HUM). Her duties included being responsible for the

prison's health clinic, except for issues which required medical judgment. (McKenna Aff. ¶ 1, docket # 19-3, ID# 281). Ms. McKenna had no involvement in authorizing or removing the co-payment deduction from plaintiff's account. (McKenna Aff. ¶¶ 3-6, ID#s 282-82).

Plaintiff states that he filed a kite complaining that the co-pay was wrongfully deducted from his account and that he should have received a hearing under the MDOC's policy directive to determine "whether the co-pay deduction was valid." (Compl. ¶ 81, ID# 17). S. Laughunn processed plaintiff's kite. Under Policy Directive 03.04.101, this type of kite is referred to the HUM for the limited purpose of reviewing the co-payment encounter to verify whether it was exempt from co-payment under the policy directive. (McKenna Aff. ¶¶ 3, 4, ID#s 281-82). Housing unit staff members are responsible for conducting the hearing and submitting the hearing report to the appropriate business office personnel. (McKenna Aff. ¶¶ 4, 6, ID# 282). HUM McKenna verified that plaintiff was not exempt from the $5 co-payment for the medical services he received on July 5, 2010. (*Id.* at ¶ 4, ID# 282).

On August 5, 2010, plaintiff filed a grievance complaining that Ms. McKenna's verification that he was not exempt from the $5 co-payment was not an adequate hearing. (docket # 1-5, ID# 181). Plaintiff's grievance was denied at Step I because his "visit on 7-5-10 [was] a chargeable visit." (*Id.* at ID# 182). The Step II and III responses reiterated that the encounter on July 5, 2010, did not fall within any exception to Policy Directive 03.04.101 and that plaintiff was responsible for the $5 co-payment. (*Id.* at ID#s 180, 184).

Blaine Lafler was DRF's warden, but is now retired. (docket # 19-2, Lafler Aff. ¶ 1, ID# 276).[9] DRF has a handicapped accessible elevator available to level II prisoners like plaintiff. (Lafler Aff. ¶ 5, ID# 277). Plaintiff states that the elevator was out of service for 57 days during the period from between April 7, 2009, through December 21, 2010. (Compl. ¶ 66, ID# 14). He asserts that service outages had an adverse impact on his use of institutional phones on 54 days, access to "yard time" on 54 days, and use of the prison's law library on 38 days. (*Id.* at ¶¶ 13, 62-72, 88, ID#s 4, 14-15, 19; Plf. Decl. ¶¶ 28-32, docket # 45, ID#s 576-77).

Michigan law requires that all elevator repairs/installations must be completed by a licensed elevator mechanic. DRF's maintenance staff members do not possess this specialized license. Elevator service is performed by an outside contractor. This contractor guarantees an on-site visit to make repairs within 48 hours of being notified of an elevator problem. On most occasions, the licensed service technician arrives at DRF within 24 hours. Elevator repairs can take from three days to two weeks, depending on the type of part needed, the location of that part, and the age of the elevator. (Lafler Aff. ¶ 6, ID# 277).

If an elevator outage prevents a prisoner from accessing DRF's law library, arrangements are made to have specified legal materials delivered to the prisoner. (Lafler Aff. ¶ 9, ID#s 277-78). When plaintiff requested additional library time because the elevator had been out of service, he received it. (Lafler Aff. ¶ 9, ID#s 277-78). Warden Lafler did not deny plaintiff access to a telephone. If plaintiff had requested to use a phone, prison staff could have attempted to make

_____

[9]Plaintiff's request that the court strike the warden's affidavit on the ground that he lacks personal knowledge (Plf. Brief at 28, docket # 44, ID# 490) is frivolous.

the necessary arrangements. Warden Lafler was not aware of any occasion where plaintiff requested to use a telephone and was prevented from doing so because an elevator was out of service. (Lafler ¶ 7, ID# 277). Lafler did not deny plaintiff out-of-cell time. Disabled prisoners housed in "800 Unit" could make arrangements to go to the prison yard or dayrooms. Warden Lafler never received a request from plaintiff seeking access to the prison's yard at a time when the elevator was out of service. (Lafler Aff. ¶ 8, ID# 277). An elevator service outage would not exempt plaintiff from prison rules. Plaintiff was not authorized to loiter in the hallways just because an elevator was out of service. (Lafler Aff. ¶ 10, ID# 278).

<u>Discussion</u>

### 1. Mootness

Plaintiff is an inmate at the Chippewa Correctional Facility (URF). His complaint concerns the conditions of his confinement at the Carson City Correctional Facility (DRF). All plaintiff's claims for injunctive and declaratory relief against officials at DRF, who no longer have control over plaintiff, are moot. *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

### 2. $5 Charge for Medical Services

Plaintiff alleges that defendant McKenna violated his rights under the Due Process Clause by erroneously charging his prisoner account a $5 co-payment for the medical services rendered on July 5, 2010, or by failing to conduct an adequate hearing to verify that the charge to plaintiff's account had been appropriate. Defendant McKenna did not deduct anything from plaintiff's account, and cannot be held liable on that basis.

In all cases where a person stands to be deprived of his life, liberty or property, he is entitled to due process of law. Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest. *See*, *e.g.*, *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001) ("Courts have long recognized that the Fourteenth Amendment requires that an individual who is deprived of an interest in liberty or property be given notice and a hearing."). HUM McKenna verified that plaintiff's prisoner account was correctly charged a $5 co-payment for the medical services he received on July 5, 2010. To the extent that plaintiff is arguing that Ms. McKenna's decision was wrong, he has not asserted a claim of constitutional dimension. The Due Process Clause does not guarantee that the procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284 n. 9 (1980). "The deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original).

In addition, the fact that defendant McKenna may have deviated from state procedural law presents no federal issue. No due process interest can be derived from a statute or regulation that merely establishes procedural requirements. *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983); *Bills v. Henderson*, 631 F.2d 1287, 1297-99 (6th Cir. 1980). The procedural due process mandated by the Constitution cannot be altered by or defined by, and therefore is not necessarily the same as, the procedures required by state law. *See Vitek v. Jones*, 445 U.S. 480, 490-91 (1980). Thus, so long as

the plaintiff received that process which was due under the Constitution, the fact that the State may have failed to comply with its own procedure does not state a cause of action under 42 U.S.C. § 1983. *Id.*; *see also Walker v. Mintzes*, 771 F.2d 920, 933-34 (6th Cir. 1985).

Plaintiff was not unconstitutionally deprived of his property by being charged for medical services which he actually received. *See Bailey v. Carter*, 15 F. App'x 245, 251 (6th Cir. 2001); *see also White v. Correctional Medical Servs.*, 94 F. App'x 262, 264 (6th Cir. 2004) ("It is constitutional to charge inmates a small fee for health care where indigent inmates are guaranteed service regardless of ability to pay.").

Moreover, plaintiff's claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Plaintiff's claim is premised upon allegedly unauthorized acts of a state official; he asserts that Ms. McKenna violated MDOC policy. Thus, plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995). He has not done so. The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies. *Id.* at 480; *see Bailey v. Carter*, 15 F. App'x at 251 (dismissing a due process claim where inmates failed to allege that post-deprivation procedure for challenging co-payment charge was inadequate); *accord Cole v. Warren County, Ky*, No. 1:11-cv-

189, 2012 WL 1950419, at * 7 (W.D. Ky. May 30, 2012). I find that defendant McKenna is entitled to judgment in her favor as a matter of law on this claim.

### 3. Eighth Amendment

Plaintiff alleges that all defendants other than defendant McKenna violated his Eighth Amendment rights under the Cruel and Unusual Punishments Clause in the medications they prescribed, the medical equipment provided, and in failing to refer plaintiff to specialists. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104-05. In judging the sufficiency of "deliberate indifference" claims, the court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention. *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified the deliberate indifference standard. Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (an objective component) and that the state official acted with a sufficiently culpable state of mind (a subjective component). 501 U.S. at 298. No reasonable trier of fact could find in plaintiff's favor on the subjective component of Eighth Amendment claims against defendants. The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994), that deliberate indifference is tantamount to a finding of

criminal recklessness.  A prison official cannot be found liable for denying an inmate humane

conditions of confinement "unless the official knows of and disregards an excessive risk to inmate

health or safety."  511 U.S. at 837.  The Sixth Circuit's decision in *Miller v. Calhoun County*, 408

F.3d 803 (6th Cir. 2005), summarized the subjective component's requirements:

> The subjective component, by contrast, requires a showing that the prison official possessed a sufficiently culpable state of mind in denying medical care.  Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.  The prison official's state of mind must evince deliberateness tantamount to intent to punish.  Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.  Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller*, 408 F.3d at 813 (citations and quotations omitted).  Where a prisoner has received some

medical attention and the dispute is over the adequacy of the treatment, federal courts are generally

reluctant to second-guess medical judgments and constitutionalize claims which sound in state tort

law.  *See Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011); *Westlake*, 537 F.2d 860 n.5;

*Reed v. Speck*, No. 12-5172, 2012 WL 6176846, at * 3 (6th Cir. Dec. 11, 2012) ("The subjective

component is intended 'to prevent the constitutionalization of medical malpractice claims.'") (quoting

*Dominguez v. Corr. Med. Servs.*, 555 F.3d at 550)).

Plaintiff has not presented evidence sufficient to support the subjective component of

an Eighth Amendment claim for deliberate indifference to serious medical needs against any

defendant.  The record shows that defendants treated plaintiff's condition on an ongoing basis and

displayed no deliberate indifference.  The unrefuted medical record shows that plaintiff received

virtually constant medical attention, at a level exceeding that available to most free citizens.  The

claims that defendants "should have" provided him with "different" medical care and referred him

to someone with greater specialization in a particular area are at best, state-law malpractice claims. Plaintiff's disagreement with defendants' diagnosis and treatment falls far short of supporting an Eighth Amendment claim. *See e.g.*, *Kosloski v. Dunlap*, 347 F. App'x 177, 180 (6th Cir. 2009); *Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 357 (6th Cir. 2006). The doctors responsible for plaintiff's care articulated substantial reasons for refusing to provide him the medications of his choice, grounded in medical judgment, not in indifference or malice.

Plaintiff's Eighth Amendment claims against the MDOC are barred by Eleventh Amendment immunity.[10] The Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

Plaintiff seeks to hold PHS vicariously liable for the acts of its employees. A private corporation cannot be held liable under § 1983 on the basis of *respondeat superior* or vicarious liability. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). Rather, the plaintiff must establish a policy or custom that caused the constitutional violation. *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008). Plaintiff vehemently argues: "Every alleged reason advanced by defendants were not medical judgments based on plaintiff's medical needs, but excuses

---

[10]Because plaintiff's claims against the MDOC under the ADA and RA are moot, it is not necessary to address whether those claims fall within an area where the State's immunity has been abrogated.

for denying care for financial reasons, for retaliation, or the blind pursuit of some unwritten policy regarding the removal of narcotic pain medication from the MDOC, despite the medical need." (docket # 68 at 24, ID# 1129). He argues that he has been denied referrals to specialists and additional tests as "cost cutting measures." (*Id.* at 28). The evidence shows that plaintiff has received an extraordinary volume of medical care and that the care provided was medically appropriate. The Constitution does not guarantee plaintiff the best and most expensive care possible. Plaintiff has not presented evidence of a custom or policy sufficient to establish entitlement to relief against PHS. *See Barnett v. Luttrell*, 414 F. App'x 784, 790 (6th Cir. 2011); *Grose v. Correctional Med. Servs., Inc.*, 400 F. App'x 986, 989 (6th Cir. 2010); *Moses v. Prison Health Servs., Inc.*, No. 2:09-cv-236, 2011 WL 1044914, at * 3-4 (W.D. Mich. Mar. 16, 2011).

Defendants are entitled to judgment in their favor as a matter of law on all plaintiff's Eighth Amendment claims.

### 4.    First Amendment

Plaintiff alleges that Drs. Stieve and Buller violated his First Amendment rights by depriving him of the prescription medications he preferred in retaliation for a grievance he filed or attempted to file. Further, plaintiff alleges that Dr. Buller violated his First Amendment rights when he failed to respond with the desired speed in producing medical evidence in support of plaintiff's request for legal writer assistance.

A.    Retaliation Claims

On summary judgment, a plaintiff asserting a First Amendment retaliation[11] claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). The plaintiff has the burden of proof on all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

"The first element [plaintiff] must establish for his retaliation claim is that he was engaged in conduct protected by the First Amendment." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). The Sixth Circuit recognizes that a prisoner's filing of a grievance can constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Frivolous grievances are not protected conduct. *See Hill v. Lappin*, 630 F.3d at 472; *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (calling a hearing officer a "foul and corrupted bitch" was not protected conduct); *Herron v. Harrison*, 203 F.3d at 415. A violation of legitimate prison rules is not protected conduct. *See Lockett*, 526 F.3d at 874; *Thaddeus-X*, 175 F.3d at 394. I will assume for analytical purposes that plaintiff's written grievances were not frivolous and could be considered protected conduct.

The second element of a retaliation claim is an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in the protected conduct. It is well

---

[11] "Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

established that "a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility." *Hix v. Tennessee Dep't of Corrections*, 196 F. App'x 350, 358 (6th Cir. 2006) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)). "[R]outine inconveniences of prison life [] do not constitute adverse action." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503 (6th Cir. 2011). Plaintiff has no right to the prescription medication of his choice. Declining to prescribe plaintiff's favored medications is not an action that would deter a person of ordinary firmness.

Under the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue. "The third element of a First Amendment retaliation claim requires the plaintiff to prove a causal connection between the protected conduct and the adverse action. When assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim. This court has held that circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) (internal quotations and citations omitted). Plaintiff must demonstrate that his protected speech was a substantial or motivating factor in the adverse action taken by defendant. Specifically, plaintiff must point to specific, nonconclusory evidence reasonably linking his speech to the adverse action. *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). The Sixth Circuit has interpreted this inquiry to mean that a motivating factor is "essentially but-for cause-without which the action being challenged simply would not have been taken." *Vereecke*, 609 F.3d at 400 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007), and *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). "Substantial case law from this circuit cautions about the permissibility of drawing an

inference of causation from temporal proximity alone." *Vereecke*, 609 F.3d at 400; *see Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity standing alone, is insufficient to establish a causal connection for a retaliation claim."). Plaintiff has not presented sufficient evidence to support a causal connection between his protected conduct and defendants' actions, and defendants have shown that they would have taken the same actions regardless of plaintiff's grievance activity because their decisions were based on medical judgment. I find that Drs. Stieve and Buller are entitled to judgment in their favor as a matter of law on plaintiff's First Amendment retaliation claims.

B.     Access to Courts

Plaintiff alleges that Dr. Buller violated his First Amendment right of access to courts when he failed to respond with the desired dispatch in producing medical evidence in support of plaintiff's request for legal writer assistance. It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005). In order to establish a viable claim for interference with his access to the courts, a plaintiff must show "actual injury" in a specific case. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996). The actual injury requirement is not satisfied by just any type of frustrated legal claim. The actual injury must be connected to direct pursuit of a non-frivolous direct appeal from a criminal conviction, a habeas corpus petition or a civil rights action under 42 U.S.C. § 1983 to vindicate "basic constitutional rights." *Lewis*, 518 U.S. at 354; *see Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("'Depriving someone of a frivolous claim ... deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.'") (quoting *Lewis*, 518 U.S. at 353). Plaintiff has not presented evidence that he suffered any actual injury within the meaning of *Lewis*.

The docket sheet, briefs and evidence filed in this matter make pellucid that plaintiff has retained access to constitutionally adequate litigation tools. *Lewis*, 518 U.S. at 355.

## Recommended Disposition

For the reasons set forth herein, I recommend that all plaintiff's claims for injunctive and declaratory relief be dismissed as moot. I further recommend that defendants' motions for summary judgment (docket # 18, 37, 55) be granted and that judgment be entered in favor of defendants on all plaintiff's claims for damages.

Dated:  March 6, 2013          /s/  Joseph G. Scoville
                               United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).